*Supp. 754
 
 SHAW, P. J.
 

 Defendants were charged in two counts of the complaint with violation of section 405 of the Labor Code. Upon a trial by jury, the defendant McEntyre was convicted on each of these counts. He then made a motion for a new trial, which was granted; and thereupon the court of its own motion dismissed these counts, as the statement on appeal declares, “for the sole reason that Section 405 of the Labor Code of the State of California when construed with Section 350b and Section 406 of the same Code was unconstitutional in that said sections, obviously intended as a regulation under the police power, operated unreasonably beyond the occasion of their enactment and thereby unlawfully limited and interfered with the right of contract”. The motion for a new trial was granted, the statement affirms, for the same sole reason. These rulings are defended here by the respondent on the ground so stated by the court.
 

 Section 405 of the Labor Code, upon which this prosecution is based, and section 406 of the same code, which must be considered with section 405, read as follows:
 

 “405. Any property put up by any employee or applicant as a bond shall not be used for any purpose other than liquidating accounts between the employer and employee or for return to the employee or applicant and shall be held in trust for this purpose and not mingled with the property of the employer. No contract between the employer and employee or applicant shall abrogate the provisions of this section. Any employer or prospective employer, or agent or officer thereof, who misappropriates any such property, mingles it with his own, or uses it for any other purpose than that herein set forth is guilty of theft and shall be punished in accordance with the provisions of the Penal Code relating to theft.
 

 “406. Any property put up by an employee, or applicant as a part of the contract of employment, directly or indirectly, shall be deemed to be put up as a bond and is subject to the provisions of this article whether the property is put up on a note or as a loan or an investment and regardless of the wording of the agreement under which it is put up. ’ ’
 

 There can be no doubt that these two sections do substantially limit the right of contract, as between an employer and his employee. It does not necessarily follow that they are invalid. “There is no absolute freedom to do as
 
 *Supp. 755
 
 one wills or to contract as one chooses.”
 
 (Chicago B. & Q. R. Co.
 
 v.
 
 McGuire,
 
 (1911) 219 U. S. 549, 567 [31 Sup. Ct. 259, 55 L. Ed. 328, 338].) The right of contract is subject to regulation and limitation in many of its phases; and there is special need for such regulation in regard to the relations between employer and employee. The prospective employer and the applicant for employment, who is usually dependent on his own earnings for the support of himself and his family, do not deal on an equal footing. Especially is this true in times of depression and widespread unemployment. Experience has shown, to the extent that it may be regarded as a matter of common knowledge, that there is great opportunity for fraudulent practices, embezzlements and other forms of cheating by employers in the common custom of requiring employees to deposit so-called “cash bonds” with their employers. The facts of this case, later discussed, well illustrate what may happen. Other cases of a similar nature have come to our attention. See, also,
 
 People
 
 v.
 
 Kelley,
 
 (1927) 81 Cal. App. 398 [253 Pac. 773], where similar facts appeared. No doubt there are many cases where an employer is acting honestly and in good faith in requiring a cash bond and will fully account for it on termination of the employment. Such an employer will have no difficulty in complying with the above-quoted requirements of the statute. But there are other cases where the principal purpose of the employer is to get possession of the “cash bond”, and the apparent offer of employment is not made in good faith at all. There are also cases where the employer, though acting in good faith at the time of receipt of the cash bond, is then in failing financial circumstances, or later becomes insolvent, and is unable to repay the cash when such repayment is due. The usual applicant for employment, in spite •of his supposed freedom of contract, is in no position to dictate the terms of his contract of employment, or to insist that it protect him against these possibilities of loss. The legislature has therefore deemed it necessary to provide such protection for him, and to that end has enacted that all deposits put up by him as part of the contract of employment be deemed bonds and that all such deposits be held intact as trust funds, and has prohibited any contract to the contrary. Considering such facts regarding the matter as are matters of general knowledge, this legislative conclusion is obviously
 
 *Supp. 756
 
 one to which reasonable minds might come. It is equally obvious that the legislation enacted in pursuance of that conclusion has a reasonable tendency to abate the evil at which it is aimed. The question whether it should have been adopted is therefore purely one of legislative discretion, not of power, and we may not, if we would, interfere with that exercise of discretion.
 
 (Matter of Miller,
 
 (1912) 162 Cal. 687, 696 [124 Pac. 427].)
 

 These conclusions are amply supported by authority. There are some cases where the courts, able to detect through legal glasses a freedom of contract on the part of employees which was invisible to the ordinary unaided vision, have condemned statutes no more extreme in their interference with the power to contract than that before us. But the modern authorities uphold such statutes in cases where the justification for them is such as appears here. In
 
 West Coast Hotel Co.
 
 v.
 
 Parrish,
 
 (1937) 300 U. S. 379, 391, 392, 393 [57 Sup. Ct. 578, 81 L. Ed. 703, 708, 709, 108 A. L. R. 1330], where a statute authorizing the fixing of minimum wages for women and minors and thus, of course, limiting their freedom of contract was upheld, the United States Supreme Court said: “The Constitution does not speak of freedom of contract. It speaks of liberty and prohibits the deprivation of liberty without due process of law. In prohibiting that deprivation the Constitution does not recognize an absolute and uncontrollable liberty. Liberty in each of its phases has its history and connotation. But the liberty safeguarded is liberty in a social organization which requires the protection of law against the evils which menace the health, safety, morals and welfare of the people. Liberty under the Constitution is thus necessarily subject to the restraints of due process, and regulation which is reasonable in relation to its subject and is adopted in the interests of the community is due process.
 

 “This essential limitation of liberty in general governs freedom of contract in particular. . . . This power under the Constitution to restrict freedom of contract has had many illustrations. That it may be exercised in the public interest with respect to contracts between employer and employee is undeniable.” Following a review of several decisions upholding statutes of the sort last mentioned, the court further said: “In dealing with the relation of employer and employee, the legislature has necessarily a wide field of discretion
 
 *Supp. 757
 
 in order that there may be suitable protection of health and safety, and that peace and good order may be promoted through regulations designed to insure wholesome conditions of work and freedom from oppression.”
 

 In
 
 Holden
 
 v.
 
 Hardy,
 
 (1898) 169 U. S. 366, 397 [18 Sup. Ct. 383, 42 L. Ed. 780, 793], where a statute limiting hours of labor in mines and smelters was upheld, the court said, in language quoted with approval in
 
 West Coast Hotel Co.
 
 v.
 
 Parrish, supra:
 
 “the fact that both parties are of full age and competent to contract does not necessarily deprive the state of the power to interfere where the parties do not stand upon an equality, or where the public health demands that one party to the contract shall be protected against himself”. In
 
 Chicago etc. R. Co.
 
 v.
 
 McGuire, supra,
 
 (1911) 219 U. S. 547, 571, 55 L. Ed. 328, 340, the court, after upholding a state statute abolishing the fellow-servant defense, said of a provision therein forbidding contracts contrary to its provisions, “Having authority to establish this regulation, it is manifest that the legislature was also entitled to insure its efficacy by prohibiting contracts in derogation of its provisions. In the exercise of this power, the legislature was not limited with respect either to the form of the contract, or the nature of the consideration, or the absolute or conditional character of the engagement.” Some of the other eases in which statutes restricting the freedom of employer and employee to contract regarding their relationship have been upheld are
 
 Alaska Packers' Assn.
 
 v.
 
 Industrial Acc. Com.,
 
 (1935) 294 U. S. 532, 543 [55 Sup. Ct. 518, 79 L. Ed. 1044, 1050];
 
 Rail & River Coal Co.
 
 v.
 
 Yaple,
 
 (1915) 236 U. S. 338, 349 [35 Sup. Ct. 359, 59 L. Ed. 607, 615]
 
 ; Miller
 
 v.
 
 Wilson,
 
 (1915) 236 U. S. 373, 380-382 [35 Sup. Ct. 342, 59 L. Ed. 628, 630, 631, L. R. A. 1915F, 829];
 
 Strathearn S. Co.
 
 v.
 
 Dillon,
 
 (1920) 252 U. S. 348, 355, 356 [40 Sup. Ct. 350, 64 L. Ed. 607, 611, 612];
 
 McLean
 
 v.
 
 Arkansas,
 
 (1909) 211 U. S. 539 [29 Sup. Ct. 206, 53 L. Ed. 315];
 
 Patterson
 
 v.
 
 The Eudora,
 
 (1903) 190 U. S. 169, 174, 175 [23 Sup. Ct. 821, 47 L. Ed. 1002, 1006];
 
 Knoxville Iron Co.
 
 v.
 
 Harbison,
 
 (1901) 193 U. S. 13, 20, 21 [22 Sup. Ct. 1, 46 L. Ed. 55, 61];
 
 Bunting
 
 v.
 
 Oregon,
 
 (1917) 243 U. S. 426 [37 Sup. Ct. 435, 61 L. Ed. 830, Ann. Cas. 1918A, 1043].
 

 These principles have found recognition in the California decisions. In
 
 In re Martin,
 
 (1909) 157 Cal. 51, 53 [106 Pac.
 
 *Supp. 758
 
 235, 26 L. R. A. (N. S.) 242], the court followed
 
 Holden
 
 v.
 
 Hardy, supra
 
 (1898), 169 U. S. 366, 42 L. Ed. 780, quoting from it the statement that ‘ ‘ The right of contract is itself subject to certain limitations which the state may lawfully impose in the exercise of its police powers”. This language was again quoted in
 
 Matter of Miller, supra,
 
 (1912) 162 Cal. 687, 693, where the court upheld a statute limiting women’s labor to eight hours a day. A statute prohibiting payment of wages in checks or orders not redeemable on demand in cash was upheld in
 
 In re Ballestra
 
 (1916), 173 Cal. 657 [161 Pac. 120], on the ground that the right to contract is subject to reasonable regulation. A statute requiring the payment of wages within a fixed time after they are earned was upheld against the objection that it unduly limited the right to contract, in
 
 Moore
 
 v.
 
 Indian Springs etc. Co.
 
 (1918), 37 Cal. App. 370, 375-379 [174 Pac. 378],
 
 Manford
 
 v.
 
 Singh,
 
 (1919), 40 Cal. App. 700 [181 Pac. 844], and
 
 In re Oswald,
 
 (1926), 76 Cal. App. 347, 350 [244 Pac. 940]. In upholding an act limiting the prices at which trademarked or branded articles may be sold by dealers, our Supreme Court said, in
 
 Max Factor & Co.
 
 v.
 
 Kunsman
 
 (1936), 5 Cal. (2d) 446, 459-461 [55 Pac. (2d) 177]: “Under its police power, the state, in a proper case, has the power, acting in the interests of the general welfare, to regulate property and contract rights, and this includes, of course, the power to regulate the right of free bargaining. . . . There are innumerable illustrations of statutes, passed under the police power, which interfere with the right of free bargaining which have been upheld on the theory the regulation is in the public interest. . . . The police . power is no longer limited to measures designed to protect life, safety, health and morals of the citizens, but extends to measures designed to promote the public convenience and the general prosperity (citations), and includes economic measures regulating competition.” Several of the federal cases' hereinbefore listed were cited with approval in this decision. These views were reaffirmed by the Supreme Court in
 
 Wholesale Tobacco Dealers Bureau, etc.,
 
 v.
 
 National Candy etc. Co.,
 
 (1938) 11 Cal. (2d) 634 [82 Pac. (2d) 3].
 

 Section 350 of the Labor Code, upon which the argument against the validity of section 405 is partly based, provides that, “as used in this article”, the terms “employer” and “employee” shall have the meanings there stated. Those
 
 *Supp. 759
 
 definitions can have no effect on section 405, for it is not a part of the article in which section 350 appears, to which, by the terms of section 350, its definitions are limited.
 

 At the trial there was evidence showing that the respondent, defendant MeEntyre, told Jack Firth, named in one of the counts under consideration as the victim, that MeEntyre was in the business of repossessing automobiles and needed more men to make repossessions and collections, that because money would be handled “a bond of $150.00 cash would have to be put up to protect the company against loss” and a contract would be drawn for its return, and that Firth would be furnished an automobile and guaranteed $35 per week. A written contract was signed by Firth and by MeEntyre and at the same time Firth gave MeEntyre $150 and MeEntyre gave Firth a promissory note for $150 and stated that the $150 would be used in the business. About ten days later MeEntyre told Firth that there was no such business, that the whole thing was just a racket and “all the money they got from suckers was divided among the members of the firm and Mr. Ashman” (another defendant). The contract above mentioned recited that Firth was to work for MeEntyre “as an individual contractor and not as an employee”, and provided that the $150 was deposited “as a guaranty of good faith” of Firth and would be returned to him after termination of the agreement.
 

 Defendant MeEntyre told the other victim, Springer, that MeEntyre needed a man to work in the business of repossessing automobiles, that “because money was collected it was necessary that a bond of $175.00 be put up to protect the company”, that the money would be used to expand the business, and that he would furnish Springer an automobile and guarantee him $35 a week. Springer signed a contract, gave MeEntyre $175 and received from him a promissory note for $175. A few days later Springer asked said MeEntyre to return his money and MeEntyre said his partner Morehouse— another defendant—had run away with all the money. The Springer contract did not state whether Springer was to be an employee or an independent contractor, but by it a firm consisting of MeEntyre and one Foote agreed, in consideration of $175, to furnish Springer claims for collection and repossession, Springer agreed to pay the firm one-half of his commissions and was to have a “drawing account” of $35
 
 *Supp. 760
 
 per week, and the $175 was to be returned to him on termination o£ the agreement. The defendant McEntyre took the stand and testified that the money he received from Firth and Springer was delivered by him to defendant Morehouse, who deposited it in a joint bank account of McEntyre and Morehouse, in which there was between $450 and $600, and that Morehouse took all this money and disappeared. No other connection of Morehouse with the transactions appears; he was not named as a party to either written contract nor was he ever mentioned to either victim as connected with their dealings.
 

 This evidence is amply sufficient to support the verdict of conviction on both counts. It supports findings that the real agreement entered into with each of the victims was one of employment, and that each of them put up money with defendant McEntyre as a part of the contract of employment. This money was therefore to be deemed a security, or bond, within the purview of the statute above quoted. It appears from McEntyre’s own testimony that he placed this money in a bank account subject to the check of defendant More-house, who had no apparent connection with either transaction. By thus placing the money in Morehouse’s control McEntyre maj? be deemed to have used it for a purpose other than holding it in trust for liquidating accounts between employer and employee and return to the employee, as required by section 405 of the Labor Code, and the trial court’s orginal finding that he was therefore guilty of violation of that section finds support on that theory.
 

 By the terms of sections 405 and 406, the facts that a note was given for each of the deposits and that each of the victims understood that the money would not be held but ■would be used in the business are immaterial if the relationship actually created was that of employer and employed. The contract made with Firth contains a recital that he was not to be an employee, but the People were not party to this contract and were not bound by it in this criminal prosecution; they were at liberty to show the true nature of the transaction by parol evidence.
 
 (People
 
 v.
 
 Martin,
 
 (1894) 102 Cal. 558, 566 [36 Pac. 952];
 
 People
 
 v.
 
 Kelley,
 
 (1927) 81 Cal. App. 398, 402, 403 [253 Pac. 773];
 
 People
 
 v.
 
 Robinson,
 
 (1930) 107 Cal. App. 211, 221 [290 Pac. 470].)
 

 The trial court has a large discretion in passing on a motion for a new trial, especially in a criminal case, and
 
 *Supp. 761
 
 where the insufficiency of the evidence is, or may be, one of the grounds upon which the order is based, its action will not be disturbed except in case of a manifest and unmistakable abuse of discretion.
 
 (People
 
 v.
 
 White,
 
 (1927) 85 Cal. App. 241, 244 [259 Pac. 76].) Ordinarily, if the order granting a new trial would have been proper on any ground, it will be sustained no matter what reason was advanced by the trial court for its ruling.
 
 (People
 
 v.
 
 Newman,
 
 (1931) 113 Cal. App. 679, 690 [298 Pac. 1044];
 
 People
 
 v.
 
 Rosenberg,
 
 (1933) 135 Cal. App. 766 [26 Pac. (2d) 922].) But we have in the record before us something other than the mere statement of a reason for the granting of a new trial. As already noted, it is declared in the statement on appeal that “the Court granted said defendant’s motion for a New Trial on the ground and for the sole reason that the provision of the Labor Code of the State of California under which defendant was prosecuted was unconstitutional”. This ground for a new trial is not one authorized by section 1451, Penal Code, or by any other provision of law, and the reason that it is not authorized is obvious: such a ground would never serve as the reason for 1 ‘ a re-examination of the issue in the same court, before another jury, after a verdict has been given”, which is what a new trial is declared to be, by section 1179, Penal Code. An appropriate procedure is provided by section 1452, Penal Code, which authorizes the arrest of the judgment if the complaint is substantially defective, as it would be if it stated no public offense.
 

 The situation presented here is not unlike that found in cases where the court has indicated in ruling on an application for probation, that it has denied probation, not in the exercise of its wide discretion but for some reason alien to its exercise. The appellate courts have not permitted the error, made apparent by the statement of the ground of the order, to escape detection and correction on the theory that it is to' be presumed that a reason within the court’s discretion was the basis of the order. Where it has appeared from the court's declaration that the ground for the order lay without the boundaries of the wide latitude given the court, the order has been reversed.
 
 (People
 
 v.
 
 Jones,
 
 (1927) 87 Cal. App. 482, 496 [262 Pac. 361];
 
 People
 
 v.
 
 Lovelace,
 
 (1929) 97 Cal. App. 228 [275 Pac. 489];
 
 People
 
 v.
 
 Freithofer,
 
 (1930) 103 Cal. App. 165, 167 [284 Pac. 484];
 
 People
 
 v.
 
 Miller,
 
 (1931) 112 Cal. App. 535, 538 [297 Pac. 40];
 
 People
 
 
 *Supp. 762
 
 v.
 
 Osterhelt,
 
 (1932) 125 Cal. App. 723, 724 [14 Pac. (2d) 140].) So here, where it appears that the trial court granted the motion for a new trial on a ground which was not one it was authorized to consider in ruling upon the motion, the error in placing reliance upon the unhallowed ground may be noted by us and requires a reversal. (See
 
 Estate of Felton,
 
 (1917) 176 Cal. 663, 667 [169 Pac. 392];
 
 Coakley
 
 v.
 
 Ajuria,
 
 (1930) 209 Cal. 745, 749 [290 Pac. 33];
 
 Union Sugar Co.
 
 v.
 
 Hollister Est. Co.,
 
 (1935) 3 Cal. (2d) 740, 750, 751 [47 Pac. (2d) 273].) Had the unauthorized reason for the order been written into it, the reason could have been given its deadly effect. (Note
 
 People
 
 v.
 
 Amer,
 
 (1907) 151 Cal. 303, 308 [90 Pac. 698], and
 
 Mathews
 
 v.
 
 Mathews,
 
 (1920) 49 Cal. App. 497, 501 [193 Pac. 586].) No less effect should be accorded the record before us. The reason for the trial court’s ruling does not appear in remarks made informally, but in its settled statement on appeal. We have a record which it would be an absurdity to fail to regard.
 

 The order dismissing counts 1 and 3 of the complaint is therefore reversed, the order granting a new trial as to counts 1 and 3 is reversed with directions to the trial court to pass upon the motion for a new trial on its merits, and to take such further proceedings as are then proper.
 

 Bishop, J., and Schauer, J., concurred.